# UNITED STATES v. GILLOCK

No. 78–1455.   Argued December 4, 1979—Decided March 19, 1980

Burger, C. J., delivered the opinion of the Court, in which Brennan, Stewart, White, Marshall, Blackmun, and Stevens, JJ., joined. Rehnquist, J., filed a dissenting·statement, in which Powell, J., joined, *post*, p. 374.

*Solicitor General McCree* argued the cause for the United States. With him on the briefs were *Assistant Attorney General Heymann, Deputy Solicitor General Frey, Jerome M. Feit,* and *Louis M. Fischer.*

*James V. Doramus* argued the cause for respondent. With him on the brief were *James F. Neal, James F. Sanders,* and *Hal Gerber.*

Mr. Chief Justice Burger delivered the opinion of the Court.

We granted certiorari to resolve a conflict in the Circuits over whether the federal courts in a federal criminal prosecu-

tion should recognize a legislative privilege barring the introduction of evidence of the legislative acts of a state legislator charged with taking bribes or otherwise obtaining money unlawfully through exploitation of his official position.[1]   441 U. S. 942 (1979).

I

Respondent Edgar H. Gillock was indicted on August 12, 1976, in the Western District of Tennessee on five counts of obtaining money under color of official right in violation of 18 U. S. C. § 1951, one count of using an interstate facility to distribute a bribe in violation of 18 U. S. C. § 1952,[2] and one count of participating in an enterprise through a pattern of racketeering activity in violation of 18 U. S. C. § 1962.   The indictment charged Gillock, then a Tennessee state senator and practicing attorney, with accepting money as a fee for using his public office to block the extradition of a defendant from Tennessee to Illinois, and for agreeing to introduce in the State General Assembly legislation which would enable four persons to obtain master electricians' licenses they had been unable to obtain by way of existing examination processes.

Before trial, Gillock moved to suppress all evidence relating to his legislative activities.   The District Court granted his motion, holding that as a state senator, Gillock had an evidentiary privilege cognizable under Rule 501 of the Federal Rules of Evidence.   This privilege, deemed by the District Court to be equivalent to that granted Members of both Houses of Congress under the Speech or Debate Clause, Art. I, § 6, cl. 1, was limited to prohibiting the introduction of evidence of Gillock's legislative acts and his underlying motivations.

---

[1] Compare *United States* v. *DiCarlo,* 565 F. 2d 802 (CA1 1977), cert. denied, 435 U. S. 924 (1978), and *United States* v. *Craig,* 537 F. 2d 957 (CA7) (en banc), cert. denied, 429 U. S. 999 (1976), with *In re Grand Jury Proceedings,* 563 F. 2d 577 (CA3 1977).

[2] The count based on 18 U. S. C. § 1952 was subsequently dismissed by the District Court.

The court stated that the privilege is necessary "to protect the integrity of the [state's] legislative process by insuring the independence of individual legislators" and "to preserve the constitutional relation between our federal and state governments in our federal system."

The Government appealed the pretrial suppression order to the United States Court of Appeals for the Sixth Circuit, see 18 U. S. C. § 3731, which vacated the order and remanded for additional consideration. 559 F. 2d 1222 (1977). The Court of Appeals noted that although the District Court had expressed its willingness to recognize a legislative privilege, it had not applied the principle to particularize items of evidence.

On remand, the Government submitted a formal offer of proof and requested a ruling on the applicability of the legislative privilege to 15 specifically described items of evidence.[3] The offer first detailed the evidence the Government proposed to introduce at trial in support of the count of the indictment charging Gillock with soliciting money from one Ruth Howard in exchange for using his influence as a state senator to block the extradition of Howard's brother, James Michael Williams. Williams had been arrested in Tennessee in November 1974, and was being held as a fugitive from Illinois. According to the offer of proof, in January 1975 Howard met in Memphis with her brother's attorney, John Hundley, who allegedly told her that he had a "friend" who could help her brother. A meeting between Gillock and Howard was arranged by Hundley, and Gillock agreed to exercise his influence to block the extradition for a fee.

The Government declared its intention to prove that on March 6, 1975, Gillock appeared at Williams' extradition

---

[3] The Government stated that the offer was made on the assumption that the District Court's prior ruling was correct. The Government, however, explicitly reserved its position that state legislators in federal criminal prosecutions are not entitled to an evidentiary privilege comparable to the Speech or Debate Clause.

hearing. Although he denied that he was attending the hearing either as an attorney or in his capacity as a state senator, Gillock reviewed the extradition papers and questioned the hearing officer about the propriety of extradition on a misdemeanor charge. Later that day, Gillock requested an official opinion from the Tennessee Attorney General concerning "Extradition on a Misdemeanor." [4]

In addition, the Government stated it intended to introduce at trial the transcript of a telephone call Gillock made to Howard on March 25, 1975. During that conversation, Gillock allegedly advised Howard that he had delayed the extradition proceedings, and could have blocked them entirely, by exerting pressure on the extradition hearing officer who had appeared before Gillock's senate judiciary committee on a budgetary matter. To corroborate that conversation, the Government indicated it would prove that on March 19, 1975, Gillock attended a meeting of the senate judiciary committee where the same extradition hearing officer who conducted Williams' extradition hearing presented his department's budget request.

Next, the Government recited the evidence it proposed to introduce showing that Gillock used his influence as a member of the Tennessee State Senate to assist four individuals in obtaining master electricians' licenses valid in Shelby County, Tenn. According to the offer of proof, the four contacted Gillock in early 1972. Two weeks later, Gillock advised them that he could get legislation enacted by the General Assembly which would provide for reciprocity in licensing. Under his proposal, a person who received a license in another county could be admitted without a test in Shelby County. The prosecution represented it would offer evidence that Gillock

---

[4] Gillock would be entitled to request an opinion from the State Attorney General by virtue of his status as a state senator. Only state government officials, not private attorneys, can secure official opinions. Tenn. Code Ann. § 8–609 (b)(6) (Supp. 1979).

fixed a contingent fee of $5,000 per person, to be refunded if the legislation was not passed.

The Government also represented that it would offer evidence that Gillock introduced reciprocity legislation in the senate and that he arranged for the introduction of a similar bill in the house. The Government further proposed to introduce statements made by Gillock on the floor of the senate in support of the bill. After the bill was passed by both branches of the legislature and forwarded to the Governor, several private persons, including union representatives, allegedly met with Gillock and voiced their opposition to the legislation. The Government intended to prove that Gillock replied that he could not financially afford to withdraw the legislation because he had already accepted "fees" for introducing it. Finally, the Government intended to prove that on April 13, 1972, Gillock moved to override the Governor's veto of the legislation, and stated that it would introduce into evidence any and all statements made by Gillock on the floor of the senate in support of his motion to override.

Based on this offer of proof, the District Court granted Gillock's renewed motion to exclude evidence of his legislative acts under Rule 501. It ruled inadmissible Gillock's official request for an opinion from the Attorney General regarding extradition and the answer to that request, and Gillock's statements to Howard that he could exert pressure on the extradition hearing officer to block the extradition because the hearing officer had appeared before Gillock's legislative committee. Similarly, the court ruled that all evidence regarding Gillock's introduction and support of the electricians' reciprocal licensing bill, his conversation with the private individuals who opposed the legislation, and the Governor's veto letter would be inadmissible.

The Government again appealed the District Court's suppression order. The Court of Appeals by a divided vote held that "the long history and the felt need for protection of

legislative speech or debate and the repeated and strong recognition of that history in the cases . . . from the Supreme Court, fully justify our affirming [the District Court] in [its] protection of the privilege in this case." 587 F. 2d 284, 290 (1978). Turning to the scope of the privilege, the court affirmed the suppression of evidence of Gillock's request for a formal opinion from the Attorney General, his participation in the senate judiciary committee, his introduction of the reciprocity legislation, his motion on the floor of the senate to override the Governor's veto, and all the statements he made on the floor of the senate. The other items of evidence were considered to be insufficiently related to the legislative process to be protected by the privilege.

## II

Gillock urges that we construct an evidentiary privilege barring the introduction of evidence of legislative acts in federal criminal prosecutions against state legislators. He argues first that a speech or debate type privilege for state legislators in federal criminal cases is an established part of the federal common law and is therefore applicable through Rule 501.[5] Second, he contends that even apart from Rule 501, a legislative speech or debate privilege is compelled by principles of federalism rooted in our constitutional structure.

It is clear that were we to recognize an evidentiary privilege similar in scope to the Federal Speech or Debate Clause, much of the evidence at issue here would be inadmissible. Recently, in *United States* v. *Helstoski,* 442 U. S. 477, 489 (1979), we reaffirmed our holding in *United States* v. *Brewster,* 408 U. S. 501, 525 (1972), that with respect to Members of Congress "[t]he Clause protects 'against inquiry into acts that occur

---

[5] Gillock makes no claim that state legislators are entitled to the benefits of the Federal Speech or Debate Clause, which by its terms applies only to "Senators and Representatives." See *Lake Country Estates, Inc.* v. *Tahoe Regional Planning Agency,* 440 U. S. 391, 404 (1979).

in the regular course of the legislative process and into the motivation for those acts.' " Under that standard, evidence of Gillock's participation in the state senate committee hearings and his votes and speeches on the floor would be privileged and hence inadmissible.

The language and legislative history of Rule 501 give no aid to Gillock. The Rule provides in relevant part that "the privilege of a witness . . . shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience." [6] Congress substituted the present language of Rule 501 for the draft proposed by the Advisory Committee of the Judicial Conference of the United States to provide the courts with greater flexibility in developing rules of privilege on a case-by-case basis. Under the Judicial Conference proposed rules submitted to Congress, federal courts would have been permitted to apply only nine specifically enumerated privileges, except as otherwise required by the Constitution or provided by Acts of Congress. See Proposed Federal Rules of Evidence 501–513, H. R. Doc. No. 93–46, pp. 9–19 (1973). Neither the Advisory Committee, the Judicial Conference, nor this Court saw fit, however, to provide the privilege sought by Gillock. Although that fact standing alone would not compel the federal courts to refuse to recognize a privilege omitted from the proposal, it does suggest that

---

[6] Rule 501 provides in full:

"Except as otherwise required by the Constitution of the United States as provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience. However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law."

the claimed privilege was not thought to be either indelibly ensconced in our common law or an imperative of federalism.[7]

Moreover, the House Conference Committee Report on the Federal Rules of Evidence leaves little doubt that Rule 501 requires the application of federal privilege law in criminal cases brought in federal court.[8]   H. R. Conf. Rep. No. 93–1597, p. 7 (1974).   Cf. *Wolfle* v. *United States*, 291 U. S. 7, 13 (1934) (the admissibility of evidence in criminal trials in the federal courts "is to be controlled by common law principles, not by local statute"); *Funk* v. *United States*, 290 U. S. 371 (1933).   Thus, the fact that there is an evidentiary privilege under the Tennessee Constitution, Art. II, § 13, which Gillock could assert in a criminal prosecution in state court does not compel an analogous privilege in a federal prosecution.

### III

Gillock argues that the historical antecedents and policy considerations which inspired the Speech or Debate Clause of the Federal Constitution should lead this Court to recognize a comparable evidentiary privilege for state legislators in federal prosecutions.   The important history of the Speech or Debate Clause has been related abundantly in opinions of this Court and need not be repeated.   See, *e. g.*, *United States* v. *Helstoski, supra; United States* v. *Brewster, supra; United States* v. *Johnson,* 383 U. S. 169 (1966).   Suffice it to recall that England's experience with monarchs exerting pressure

---

[7] We also find it significant that we have not been cited to a single instance in the legislative history of Rule 501 where any Member of Congress manifested interest in providing an evidentiary privilege for state legislators charged in federal court with a violation of a federal criminal statute.

[8] This is not to suggest that the privilege law as developed in the states is irrelevant.   This Court has taken note of state privilege laws in determining whether to retain them in the federal system.   See, *e. g.*, *Trammel* v. *United States, ante,* p. 40 (rejection of the antimarital facts privilege).

on members of Parliament by using judicial process to make them more responsive to their wishes led the authors of our Constitution to write an explicit legislative privilege into our organic law. In statutes subject to repeal or in judge-made rules of evidence readily changed by Congress or the judges who made them, the protection would be far less than the legislative privilege created by the Federal Constitution.

Our cases, however, have made clear that "[a]lthough the Speech or Debate Clause's historic roots are in English history, it must be interpreted in light of the American experience, and in the context of the American constitutional scheme of government rather than the English parliamentary system." *United States* v. *Brewster,* 408 U. S., at 508. In deciding whether the principles underlying the federal constitutional speech or debate privilege compel a similar evidentiary privilege on behalf of state legislators, the analysis must look primarily to the American experience, including our structure of federalism which had no counterpart in England.

Two interrelated rationales underlie the Speech or Debate Clause: first, the need to avoid intrusion by the Executive or Judiciary into the affairs of a coequal branch, and second, the desire to protect legislative independence. *Eastland* v. *United States Servicemen's Fund,* 421 U. S. 491, 502–503 (1975). Cases considering the Speech or Debate Clause have frequently arisen in the context of a federal criminal prosecution of a Member of Congress and have therefore accented the first rationale. Only recently in such a case, we re-emphasized that a central purpose of the Clause is "to preserve the constitutional structure of separate, coequal, and independent branches of government. The English and American history of the privilege suggests that any lesser standard would risk intrusion by the Executive and the Judiciary into the sphere of protected legislative activities." *United States* v. *Helstoski,* 442 U. S., at 491. Accord, *United States* v. *Johnson, supra,* at 180–181. The Framers viewed the speech or debate privilege as fundamental to the system of checks and balances. 8 The

Works of Thomas Jefferson 322 (Ford ed. 1904); 1 The Works of James Wilson 421 (R. McCloskey ed. 1967).

The first rationale, resting solely on the separation of powers doctrine, gives no support to the grant of a privilege to state legislators in federal criminal prosecutions. It requires no citation of authorities for the proposition that the Federal Government has limited powers with respect to the states, unlike the unfettered authority which English monarchs exercised over the Parliament. By the same token, however, in those areas where the Constitution grants the Federal Government the power to act, the Supremacy Clause dictates that federal enactments will prevail over competing state exercises of power. Thus, under our federal structure, we do not have the struggles for power between the federal and state systems such as inspired the need for the Speech or Debate Clause as a restraint on the Federal Executive to protect federal legislators.

Apart from the separation of powers doctrine, it is also suggested that principles of comity require the extension of a speech or debate type privilege to state legislators in federal criminal prosecutions. However, as we have noted, federal interference in the state legislative process is not on the same constitutional footing with the interference of one branch of the Federal Government in the affairs of a coequal branch. *Baker* v. *Carr,* 369 U. S. 186, 210 (1962). Cf. *Dombrowski* v. *Pfister,* 380 U. S. 479, 489–492 (1965) (federal court may enjoin state-court application of a clearly unconstitutional statute).[9] Our opinion in *National League of Cities* v. *Usery,* 426 U. S. 833 (1976), is not to the contrary. There, we held that a federal statute regulating the wages of state

---

[9] Compare *Powell* v. *McCormack,* 395 U. S. 486 (1969) (suit for injunction against individual Members of Congress to require the seating of Representative Adam Clayton Powell barred by the Speech or Debate Clause), with *Bond* v. *Floyd,* 385 U. S. 116 (1966) (individual state legislators enjoined from depriving Julian Bond of his seat in the Georgia Legislature).

employees was unconstitutional because it "operate[d] to directly displace the States' freedom to structure integral operations in areas of traditional governmental functions." *Id.,* at 852.

The absence of a judicially created evidentiary privilege for state legislators is not, however, comparable intervention by the Federal Government into essential state functions. First, Gillock's argument, resting on the Tenth Amendment, has no special force with regard to state legislators; on the rationale advanced, state executive officers and members of the state judiciary would have equally plausible claims that the denial of an evidentiary privilege to them resulted in a direct federal impact on traditional state governmental functions. Moreover, we recognized in *National League of Cities* that the regulation by Congress under the Commerce Clause of individuals is quite different from legislation which directly regulates the internal functions of states. *Id.,* at 840–841. Although the lack of an evidentiary privilege for a state legislator might conceivably influence his conduct while in the legislature, it is not in any sense analogous to the direct regulation imposed by the federal wage-fixing legislation in *National League of Cities.*

The second rationale underlying the Speech or Debate Clause is the need to insure legislative independence. Gillock relies heavily on *Tenney* v. *Brandhove,* 341 U. S. 367 (1951), where this Court was cognizant of the potential for disruption of the state legislative process. The issue there, however, was whether state legislators were immune from civil suits for alleged violations of civil rights under 42 U. S. C. § 1983. The claim was made by a private individual who alleged that a state legislative committee hearing was conducted to prevent him from exercising his First Amendment rights. The Court surveyed the history of the speech or debate privilege from its roots in the British parliamentary experience through its adoption in our own Federal Constitu-

tion. In light of these "presuppositions of our political history," 341 U. S., at 372, the Court stated:

> "We cannot believe that Congress—itself a staunch advocate of legislative freedom—would impinge on a tradition so well grounded in history and reason by covert inclusion in the general language [of § 1983] before us." *Id.*, at 376.

Accordingly, the Court held that a state legislator's common-law absolute immunity from civil suit survived the passage of the Civil Rights Act of 1871.[10]

Although *Tenney* reflects this Court's sensitivity to interference with the functioning of state legislators, we do not read that opinion as broadly as Gillock would have us. First, *Tenney* was a civil action brought by a private plaintiff to vindicate private rights. Moreover, the cases in this Court which have recognized an immunity from civil suit for state officials have presumed the existence of federal criminal liability as a restraining factor on the conduct of state officials. As recently as *O'Shea* v. *Littleton,* 414 U. S. 488 (1974), we stated:

> "Whatever may be the case with respect to civil liability generally, . . . or civil liability for willful corruption, . . . we have never held that the performance of the duties of judicial, legislative, or executive officers, requires or contemplates the immunization of otherwise criminal deprivations of constitutional rights. . . . *On the contrary, the judicially fashioned doctrine of official immunity does not reach 'so far as to immunize criminal conduct proscribed by an Act of Congress. . . .'* Gravel v. United States, 408 U. S. 606, 627 (1972)." *Id.,* at 503 (emphasis supplied).

---

[10] Despite the frequent invocation of the federal Speech or Debate Clause in *Tenney,* the Court has made clear that the holding was grounded on its interpretation of federal common law, not on the Speech or Debate Clause. See *Lake Country Estates, Inc.* v. *Tahoe Regional Planning Agency,* 440 U. S., at 404.

Accord, *Imbler* v. *Pachtman,* 424 U. S. 409, 429 (1976); *Scheuer* v. *Rhodes,* 416 U. S. 232 (1974). Thus, in protecting the independence of state legislators, *Tenney* and subsequent cases on official immunity have drawn the line at civil actions.[11]

We conclude, therefore, that although principles of comity command careful consideration, our cases disclose that where important federal interests are at stake, as in the enforcement of federal criminal statutes, comity yields. We recognize that denial of a privilege to a state legislator may have some minimal impact on the exercise of his legislative function; however, similar arguments made to support a claim of Executive privilege were found wanting in *United States* v. *Nixon,* 418 U. S. 683 (1974), when balanced against the need of enforcing federal criminal statutes. There, the genuine risk of inhibiting candor in the internal exchanges at the highest levels of the Executive Branch was held insufficient to justify denying judicial power to secure all relevant evidence in a criminal proceeding. See also *United States* v. *Burr,* 25 F. Cas. 187 (No. 14,694) (CC Va. 1807). Here, we believe that recognition of an evidentiary privilege for state legislators for their legislative acts would impair the legitimate interest of the Federal Government in enforcing its criminal statutes with only speculative benefit to the state legislative process.[12]

---

[11] Federal prosecutions of state and local officials, including state legislators, using evidence of their official acts are not infrequent. See, *e. g.,* *United States* v. *Rabbitt,* 583 F. 2d 1014 (CA8 1978), cert. denied, 439 U. S. 1116 (1979); *United States* v. *Mazzei,* 521 F. 2d 639 (CA3), cert. denied, 423 U. S. 1014 (1975); *United States* v. *Homer,* 411 F. Supp. 972 (WD Pa. 1976). See also *Anderson* v. *United States,* 417 U. S. 211, 214–215 (1974). Of course, even a Member of Congress would not be immune under the federal Speech or Debate Clause from prosecution for the acts which form the basis of the Hobbs Act, 18 U. S. C. § 1951, and RICO, 18 U. S. C. § 1962, charges here. See *United States* v. *Helstoski,* 442 U. S. 477 (1979).

[12] Cf. *Gravel* v. *United States,* 408 U. S. 606, 627 (1972) ("[W]e cannot

## IV

The Federal Speech or Debate Clause, of course, is a limitation on the Federal Executive, but by its terms is confined to federal legislators. The Tennessee Speech or Debate Clause is in terms a limit only on the prosecutorial powers of that State. Congress might have provided that a state legislator prosecuted under federal law should be accorded the same evidentiary privileges as a Member of Congress. Alternatively, Congress could have imported the "spirit" of *Erie R. Co.* v. *Tompkins,* 304 U. S. 64 (1938), into federal criminal law and directed federal courts to apply to a state legislator the same evidentiary privileges available in a prosecution of a similar charge in the courts of the state. But Congress has chosen neither of these courses.

In the absence of a constitutional limitation on the power of Congress to make state officials, like all other persons, subject to federal criminal sanctions, we discern no basis in these circumstances for a judicially created limitation that handicaps proof of the relevant facts. Accordingly, the judgment of the Court of Appeals for the Sixth Circuit is

*Reversed.*

MR. JUSTICE REHNQUIST, with whom MR. JUSTICE POWELL joins, dissenting.

For the reasons stated by Chief Judge Edwards in his opinion in this case for the Court of Appeals for the Sixth Circuit, I would affirm the judgment of that court.

---

carry a judicially fashioned privilege so far as to immunize criminal conduct proscribed by an Act of Congress or to frustrate the grand jury's inquiry into whether publication of these classified documents violated a federal criminal statute").