**UNITED STATES of America,**

v.

**Edwin P. WILSON, Defendant.**

**Marian S. ROSEN and Marian S. Rosen & Associates, Movant,**

v.

**UNITED STATES DEPARTMENT OF JUSTICE, Respondent.**

No. S 83 Cr. 69.

United States District Court, S.D. New York.

Sept. 2, 1983.

Marian S. Rosen, Houston, Tex., pro se and for law firm of Marian S. Rosen & Associates.

Rudolph W. Giuliani, U.S. Atty., S.D. N.Y., New York City, for the U.S.; Eugene Neal Kaplan, Kenneth I. Schacter, Asst. U.S. Attys., New York City, of counsel.

## OPINION

EDWARD WEINFELD, District Judge.

This is a motion by Marian S. Rosen, an attorney of Houston, Texas, individually and on behalf of the law firm of Marian S. Rosen & Associates ("Rosens"), pursuant to the Right to Financial Privacy Act ("RFPA" or "Act")[1] and Rule 17(c), Fed.R. Crim.P., to quash subpoenas duces tecum served upon the Rosens and upon their bank, the Texas Commerce Bank, Houston, Texas, to obtain certain financial records. The documents are sought for use in an upcoming trial in this district wherein Edwin P. Wilson is the defendant. The Rosens represented Wilson in a prior criminal trial in the United States District Court for the Southern District of Texas.[2]

1. 12 U.S.C. §§ 3401–22 (Supp. V 1981).

2. *United States v. Wilson,* No. H82–139 (S.D. Tex. judgment entered Feb. 24, 1983), *appeal docketed,* No. 83–2125 (5th Cir. Mar. 7, 1983).

The government, in addition to opposing the motion, cross-moves pursuant to Rule 17(c), Fed.R.Crim.P., for an order directing that documents designated in the subpoenas, as modified, be produced at least two weeks prior to the Wilson trial, now scheduled for October 3, 1983.

The indictment upon which Wilson is to go to trial in this district generally charges, among other matters, that he hired individuals to assassinate witnesses, federal prosecutors, and other persons involved in the then pending or concluded trials in other district courts of the United States and promised to pay these individuals substantial monies for their illicit services. The subpoena initially served by the government upon the Texas Commerce Bank, dated August 8, 1983, sought records of all accounts maintained by the Rosens at that bank for the period December 1, 1982, to April 1, 1983. Simultaneously, the government served a subpoena duces tecum upon the Rosens for the production of records with respect to the payment of fees to the Rosens by Wilson or on his behalf, as well as records relating to the transfer in January, February, and March, 1983, of funds to these bank accounts by way of electronic or wire transfer on behalf of Wilson by one Diana Byrne and named banks in England. The government also provided the Rosens with notice that it had subpoenaed the bank records.[3]

After service of the subpoenas, the prosecution obtained more specific information as to the amount and method of transfer of funds following a further investigation and a telephone call to England by Assistant United States Attorneys. As a result, the subpoenas were modified so that what is now sought are "documents that relate to the transfer of funds [approximately 84,085 Pounds Sterling] from a Wilson controlled bank account in Europe (now known to be one at the Algemene Bank Netherlands, N.V., St. Helier, Jersey, Channel Islands

3. Such notice is required under the RFPA. *See* 12 U.S.C. § 3407(2) (Supp. V 1981).

("ABN Jersey")) to a Rosen account at the Texas Commerce Bank (now known to be the Rosen trust account # 130–1365) during January and February, 1983 (now known to have occurred on or about February 8, 1983) and such further documents as show the disposition of such funds." The government, further defining the scope of these subpoenas, states that "to the extent that the subpoena[s] require[ ] production of documents other than those evidencing the transfer by Wilson's agents in the United Kingdom to the Rosen account of approximately 84,085 Pounds Sterling and its disbursement on receipt, [they] hereby [are] limited in scope to exclude any such documents."[4]

▪ The RFPA grants bank customers a limited right to challenge subpoenas served by federal officials on banks and other financial institutions.[5] If a customer is properly notified of the subpoena, as was the case here, the subpoena must be upheld if it complies with three requirements. First, the subpoena must "reasonably describe[ ]" the financial records to be produced.[6] Second, the subpoena must be "authorized by law."[7] Third, there must be "reason to believe that the records sought are relevant to a legitimate law enforcement inquiry."[8] On the record before the Court, each of these requirements is amply met. As now limited by the government, the subpoena served on the bank describes with particularity the documents sought. There is no question that the United States Attorney was authorized to issue such a subpoena.[9] The only remotely serious question under the Act is whether the government has shown a reasonable basis for belief that the bank records at issue are "relevant to a

legitimate law enforcement inquiry." The Rosens contend that any funds transferred to the United States were for payment of legal expenses and that any trust accounts that have been maintained are for the purpose of prosecuting Wilson's appeals in other litigation. They thus suggest that the funds may not have been under Wilson's control following their transfer. Even accepting this premise, however, the bank records are clearly relevant to the government's prosecution of Wilson in this district. The indictment specifically alleges that in January, 1983, Wilson told one Wayne Trimmer "that he would pay Trimmer and purported 'hit man' Tony DeAngelo $250,000 each for the assassinations of Assistant Untied [sic] States Attorney E. Lawrence Barcella, Jr., and Carol Bruce." The government's affidavit specifically alleges that approximately 84,085 Pounds Sterling was transferred to the Rosen account on February 8, 1983. The Rosens make no claim that Wilson did not, during the month of January, 1983, have control over and access to these alleged funds, and evidence of such control and access would be probative of whether Wilson made the alleged statements to Trimmer and in fact had an available source of funds to pay the assassins. Since the RFPA requires only that financial information be relevant to a "legitimate law enforcement inquiry," and not relevant in a narrow, evidentiary sense, the subpoena served on the bank clearly passes muster under the Act.

▪ Contrary to the contentions of the Rosens, the Act imposes no duty on the government to obtain the information contained in the bank records from another source. The fact that the information may

---

4. Government's Memorandum of Law at 3–4.

5. The Supreme Court held in 1976 that individuals have no fourth amendment interest in the records banks and other financial institutions are required to maintain. *United States v. Miller,* 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976). The RFPA was enacted to ameliorate the effect of the *Miller* decision in limited respects. *See* H.R.Rep. 95–1383, 94th Cong., 2d Sess. 33–35, *reprinted in* 1978 U.S.Code Cong. & Ad.News 9273, 9305–07.

6. 12 U.S.C. § 3402 (Supp. V 1981).

7. *Id.* § 3407(1).

8. *Id.* All three substantive requirements of the RFPA are substantially reiterated in the provisions for judicial review. *See id.* § 3410(c).

9. *See* 28 U.S.C. § 547 (1976).

be available from other sources does not in itself entitle the Rosens to their requested relief. First, Diana Byrne, a principal witness to the transaction whereby the funds were transferred from Wilson's control in England to the United States, is a resident of England and not subject to subpoena upon a trial. Second, even if she were voluntarily to appear and testify at the trial or were her deposition to be taken pursuant to Fed.R.Crim.P. 15, the government is entitled to avail itself of corroborating evidence of the transaction. Since the customer challenge procedures "constitute the sole judicial remedy available to a customer to oppose disclosure of financial records . . . ," [10] and since the government has complied with those provisions, the subpoena served on the bank must be sustained.[11]

The Rosens claim, notwithstanding any ruling on a subpoena to the bank, that the subpoena addressed to them must be quashed under Rule 17(c), Fed.R.Crim.P., or, alternatively, to give effect to the attorney/client privilege. There is no substantial question under Rule 17(c). As it is required to do under the rule, the government has shown that the materials sought are relevant, admissible, and specifically described.[12] Ms. Rosen and her firm have not contested the subpoena directed at them on the ground that compliance would simply duplicate production of material from the bank.[13] There is nothing before the Court to impugn the government's good faith in requesting the information for use upon the trial.[14]

■ The attorney/client privilege, however, operates as an independent constraint on the government's subpoena power.[15] Yet the information sought by the government is beyond the protection of the privilege. The Rosens claim that disclosure of the financial information called for by the subpoenas would "implicate the client in the very criminal activity for which legal advice is sought." This argument fails of its own terms. The Rosens do not allege that Mr. Wilson retained them or that they counselled him with respect to the charges at issue here—that he plotted to assassinate government officials and witnesses. The fact is that they were the attorneys in a prosecution in the United States District Court for the Southern District of Texas entirely unrelated to the instant charge. That prosecution has been concluded by Wilson's conviction and his case is now on appeal. With respect to the indictment in this district, Wilson is represented by other attorneys.

■ Moreover, the Rosens' representation of Mr. Wilson and the amount of their

---

**10.** 12 U.S.C. § 3410(e) (Supp. V 1981); *see also id.* § 3410(f) (no customer standing to assert rights of financial institution).

**11.** The Rosens rely on two aspects of state law as additional grounds for quashing the subpoena served on the bank: (1) Tex. Const. art. 1, § 9 (1982); and (2) Tex.Rev.Civ.Stat.Ann. art. 342–705 (Vernon 1982). The Rosens, however, cite no decision of any Texas court that interprets the Texas Constitution to require greater protection than required under the federal Constitution, as interpreted in *Miller,* 425 U.S. at 440–443, 96 S.Ct. at 1622–24. Even assuming the state statute would be construed to bar disclosure in the face of compliance with the RFPA, a federal court, confronted with such a conflict, is obliged to ignore the state-created barrier. *United States v. Gillock,* 445 U.S. 360, 373, 100 S.Ct. 1185, 1193, 63 L.Ed.2d 454 (1980) (importance of interest in enforcement of federal criminal statutes); *In re Hampers,* 651 F.2d 19, 23 (1st Cir.1981) (although state law barred absolutely the disclosure of state tax records to federal grand jury, federal court would grant

such records only the same limited immunity that Congress had afforded federal tax records sought by a federal grand jury). In light of the Court's disposition of the Rosens' arguments that the subpoena served on them should be quashed as in violation of Fed.R.Crim.P. 17(c) and the attorney/client privilege, it is not necessary to address whether these arguments need also be considered in an RFPA customer challenge proceeding.

**12.** *United States v. Nixon,* 418 U.S. 683, 700, 94 S.Ct. 3090, 3103, 41 L.Ed.2d 1039 (1974).

**13.** *Id.* at 699, 94 S.Ct. at 3103 (citing *United States v. Iozia,* 13 F.R.D. 335, 338 (S.D.N.Y. 1952)).

**14.** *Id.*

**15.** *Id.* at 703, 94 S.Ct. at 3105; *cf. United States v. Cuthbertson,* 651 F.2d 189, 195 (3d Cir.) (news gatherer's privilege), *cert. denied,* 454 U.S. 1056, 102 S.Ct. 604, 70 L.Ed.2d 594 (1981).

**1422**

fees in other matters, to the extent they are revealed in records maintained at the bank, are facts that have been disclosed to third parties.[16] As Judge Pierce, then a District Judge, noted in refusing to find that a payment of fees was a confidential communication: [17]

> Here, the client is known and his motive [with regard to acts prior to execution of a retainer] is not an element that will necessarily be revealed. The fact situation of the present case is much closer to that of attorneys for identified taxpayers who are being investigated by the Internal Revenue Service. There, the taxpayers are known and the amount of fees which they have paid their attorneys has generally been held to be without the attorney/client privilege.

The Court thus finds that the material subject to the subpoena served upon the Rosens is not protected by the attorney/client privilege. Accordingly, the subpoena on the Rosens is upheld.

██ The Rosens allege in their moving papers and urged at oral argument that enforcement of the subpoena directed against them would infringe Wilson's sixth amendment right to the effective assistance of counsel in the prosecution of his appeal from his conviction in Texas. The subpoena, however, does not specifically call for, and the Court does not construe it to call for, the production of itemized bills for legal services, logs of telephone calls made in the course of defending Mr. Wilson at trial or on appeal, or other documents that would indicate Mr. Wilson's legal strategy during the trial or appellate process, or disclosure, otherwise, of material protected by the work product doctrine. So construed, the subpoena raises no question under the sixth amendment.[18]

The Court grants the government's motion to compel the Rosens to produce, no later than September 19, 1983, the documents called for in the subpoena, dated August 8, 1983, served upon them, as modified by the government. The Court also denies the motion to quash the subpoena served upon the Texas Commerce Bank of Houston, Texas.

So ordered.

16. *Miller,* 425 U.S. at 442, 96 S.Ct. at 1623.

17. *Application of Doe,* 464 F.Supp. 757, 760 (S.D.N.Y.1979). *See United States v. Sykes,* 697 F.2d 87, 89 n. 1 (2d Cir.1983); *In re Katz,* 623 F.2d 122, 126 n. 3 (2d Cir.1980) (quoting *Colton v. United States,* 306 F.2d 633, 637 (2d Cir.1962), *cert. denied,* 371 U.S. 951, 83 S.Ct. 505, 9 L.Ed.2d 499 (1963)).

18. *See United States v. Nobles,* 422 U.S. 225, 238, 240 & n. 15, 95 S.Ct. 2160, 2170, 2171 & n. 15, 45 L.Ed.2d 141 (1975).