Carlos **ROMERO–BARCELO,**
Plaintiff, Appellant,

v.

Miguel **HERNANDEZ–AGOSTO,** et al., **Defendants, Appellees.**

No. 95–1235.

United States Court of Appeals, First Circuit.

Heard Aug. 1, 1995.

Decided Jan. 31, 1996.

Michael J. Rovell, with whom Lisa I. Fair, Hilary A. Higgins, Carlos G. Latimer and Latimer, Biaggi, Rachid, Rodriguez, Suris & Godreau, Santurce, PR, were on brief for appellant.

Marcos A. Ramírez–Lavandero, with whom Eduardo A. Vera–Ramírez and Marcos A. Ramírez–Lavandero & Associates were on brief, San Juan, PR, for appellees.

Before SELYA, CYR and LYNCH, Circuit Judges.

CYR, Circuit Judge.

This appeal involves the most recent installment in the ongoing Cerro Maravilla political scandal, which has engaged public attention in the Commonwealth of Puerto Rico for more than fifteen years, and enlisted our attention on several occasions since 1981. In this latest sequel, plaintiff Carlos Romero–Barcelo (or "appellant") challenges a district court judgment dismissing various civil rights claims, with prejudice, based on absolute legislative immunity and failure to state a claim, and dismissing, without prejudice, certain pendent claims under Puerto Rico law. We affirm the district court judgment in all respects.

# I

## BACKGROUND [1]

On February 22, 1981, the Puerto Rico Senate, then controlled by the Popular Democratic Party ("PDP"), authorized an investigation into the brutal ambush and murders of two pro-independence youths, Arnaldo Dario–Rosado and Carlos Soto–Arrivi, by Commonwealth police officers at Cerro Maravilla in the mountains of Puerto Rico dur-

---

1. Rule 12(b)(6) dismissals are reviewed under the rubric that "all reasonable inferences from well-pleaded facts are to be drawn in appellant['s] favor." *Calero–Colon v. Betancourt–Lebron,* 68 F.3d 1, 2 n. 1 (1st Cir.1995).

ing the summer of 1978. At the time of the murders, appellant Romero–Barcelo was the Governor of Puerto Rico, and headed the New Progressive Party ("NPP") which controlled the Senate. As part of the Senate investigation, subpoenas were issued for documents in the possession of the Puerto Rico Justice Department. In due course, this court vacated a district court order quashing the subpoenas, *In re San Juan Star Co.*, 662 F.2d 108, 111, 118–20 (1st Cir.1981), while noting that a state legislature might be enjoined "in a proper case." *Colon Berrios v. Hernandez Agosto*, 716 F.2d 85, 88 (1st Cir. 1983) (internal quotation marks omitted).

Following the *San Juan Star* decision, the Senate Judiciary Committee (or "Committee") gained access to materials which—together with other documents and testimony gathered in executive session—formed the basis for televised Committee hearings (or "Hearings") which began June 15, 1983. The Senate voted to pay to televise the Hearings on a commercial station and "the hearings were apparently widely viewed." *Id.* at 87. Thereafter, we reversed a district court order enjoining Committee members and their agents from compelling some of the defendants in a separate civil rights action arising out of the murders of Dario–Rosado and Soto–Arrivi (the "Soto" litigation), *see Soto v. Romero Barcelo*, 559 F.Supp. 739, 740–41 (D.P.R.1983), to appear and testify publicly at the Hearings; and, "from publishing documents in the [Committee members'] possession that are covered by the protective order issued in [the Soto litigation] or that are transcripts of testimony before the Committee by [some of the Soto defendants]." *Colon Berrios*, 716 F.2d at 86, 87.

The Hearings were reconvened in October 1984, preparatory to the November 1984 gubernatorial elections in which Romero–Barcelo ran for reelection and lost. Following a break in the political action, the most recent round of Hearings began in October 1991, as a prelude to a PDP-sponsored referendum in December 1991 on the future intergovernmental relationship between Puerto Rico and the United States. Once Romero–Barcelo announced his candidacy for Resident Commissioner, these Hearings were extended

through May 1992. During the latter phases of the Hearings, while the PDP controlled the Senate, defendant-appellee Miguel Hernandez–Agosto served as Senate President, defendant-appellee Marco Antonio–Rigau headed the Senate Judiciary Committee, and defendant-appellee Edgardo Perez–Viera, chief counsel, directed Committee investigative efforts.

Appellant Romero–Barcelo claims, *inter alia*, that Committee members slanted and manipulated the Committee testimony and evidence to suggest that he had been involved in the planning and shooting of the two youths at Cerro Maravilla, and in subsequent attempts to cover up the murders. He alleges that witnesses were interviewed in private, without legal assistance; subpoenas were issued without notifying all Committee members; only one Committee investigator was appointed and he reported exclusively to the PDP majority; access to all documents, transcripts of testimony, evidence, and reports was restricted to PDP members, their aides and assistants; the Committee violated a Puerto Rico Supreme Court order that the documents and other materials be made available to the NPP minority; witnesses were not allowed access to transcripts of their prior testimony before testifying; an investigative report—finding no wrongdoing by Romero–Barcelo—was covered up; the witness microphone was turned off when testimony did not suit defendants Hernandez–Agosto and Antonio–Rigau, or other PDP members.

Romero–Barcelo alleges that from the late 1970s the defendants and the Committee continuously labelled him as an assassin or murderer, even though no evidence was ever submitted to substantiate the charge; that defendant Perez presented information at the Hearings, and subsequently through press releases and television and radio interviews, knowing it to be false or misleading; that the defendants continually disseminated false information outside the legislative chambers, through television broadcasts made at government expense, press releases and interviews arranged and conducted at the Legislature in public areas and at television studios, political speeches delivered in various munici-

palities, press releases distributed to news media within and beyond Puerto Rico, as well as written and oral communications to the United States Senate and House of Representatives, federal departments, and agencies. Appellant complains that the defendants held press conferences at radio and television stations and other public forums after the Hearings, publicly passing judgment on statements made before the Committee regarding the credibility of witnesses, the strength or weakness of the evidence, and publicly accusing witnesses and third parties, including Romero–Barcelo, of perjury before the Committee. This campaign allegedly was carried out through public speechmaking and political campaign rallies, as well as television and radio broadcasts, newspapers, and by other public means.

In September 1992, appellant brought suit in federal district court under 42 U.S.C. § 1983, asserting violations of his First, Fifth, and Fourteenth Amendment rights under the United States Constitution, and under 42 U.S.C. § 1985(3), for conspiracy to deprive him of these constitutional rights. He demanded compensatory and punitive damages, costs, and attorney fees. *See* 28 U.S.C. §§ 1331 (federal question) and 1343 (civil rights and elective franchise). Finally, he alleged supplemental claims for libel and slander under Puerto Rico law. *See* 28 U.S.C. § 1367. The defendants moved to dismiss under Fed.R.Civ.P. 12(b)(6), asserting absolute legislative immunity, and failure to state a claim. The district court dismissed all federal claims, with prejudice, and the libel and slander claims, without prejudice. Romero–Barcelo appealed.

## II

### DISCUSSION[2]

■ We first consider the alleged conduct that the district court found to be protected under the doctrine of absolute legislative im-

munity. Next, we determine whether the remaining conduct in which defendants are alleged to have engaged gave rise to any actionable claim under either section 1983 or section 1985(3).

### A. *Absolute Legislative Immunity*

■ A defense of absolute legislative immunity for state legislators has been recognized since 1951. *Colon Berrios,* 716 F.2d at 89 (citing *Tenney v. Brandhove,* 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951)). Of course, absolute immunity affords protection not only from liability but from suit. *Agromayor v. Colberg,* 738 F.2d 55, 57 (1st Cir.), *cert. denied,* 469 U.S. 1037, 105 S.Ct. 515, 83 L.Ed.2d 405 (1984) (citing *Helstoski v. Meanor,* 442 U.S. 500, 506–08, 99 S.Ct. 2445, 2448–49, 61 L.Ed.2d 30 (1979)). State legislative immunity is " 'similar in origin and rationale to that accorded Congressmen under the Speech or Debate Clause' " of the United States Constitution. *Negron–Gaztambide v. Hernandez–Torres,* 35 F.3d 25, 27 (1st Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1098, 130 L.Ed.2d 1066 (1995) (quoting *Supreme Court of Va. v. Consumers Union of the United States, Inc.,* 446 U.S. 719, 732, 100 S.Ct. 1967, 1974–75, 64 L.Ed.2d 641 (1980)). Although not based on the doctrine of separation of powers, as is the constitutional immunity accorded Members of Congress, the state legislative immunity defense nonetheless implicates "principles of comity and federalism. . . ." *Agromayor,* 738 F.2d at 58–59 (citing *United States v. Gillock,* 445 U.S. 360, 370–73, 100 S.Ct. 1185, 1192–94, 63 L.Ed.2d 454 (1980)). *See also National Ass'n of Social Workers v. Harwood,* 69 F.3d 622, 628 (1st Cir.1995).

■ The immunity defense in this case protects only conduct within the "sphere of legitimate legislative activity." *Colon Berrios,* 716 F.2d at 89 (citing *Doe v. McMillan,* 412 U.S. 306, 320, 93 S.Ct. 2018, 2028–29, 36 L.Ed.2d 912 (1973); *Tenney,* 341 U.S. at

---

2. We review Rule 12(b)(6) dismissals *de novo. Clarke v. Kentucky Fried Chicken of Cal., Inc.,* 57 F.3d 21, 22 n. 1 (1st Cir.1995). "The pleading requirements, though 'minimal,' are not 'nonexistent.' " *Rumford Pharmacy, Inc. v. City of East Providence,* 970 F.2d 996, 998 (1st Cir.1992) (quoting *Gooley v. Mobil Oil Corp.,* 851 F.2d 513,

515 (1st Cir.1988) ("Modern notions of 'notice pleading' notwithstanding, a plaintiff . . . is nonetheless required to set forth factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory.")).

376–77, 71 S.Ct. at 788–89). Absolute legislative immunity "is justified and defined by the *functions* it protects and serves, not by the person to whom it attaches." *Negron–Gaztambide,* 35 F.3d at 27 (quoting *Forrester v. White,* 484 U.S. 219, 227, 108 S.Ct. 538, 544, 98 L.Ed.2d 555 (1988)). "[I]t is the nature of the particular act rather than the title of the office which governs whether immunity attaches." *Acevedo–Cordero v. Cordero–Santiago,* 958 F.2d 20, 21 (1st Cir.1992); *see also Agromayor,* 738 F.2d at 59. "Acts ... that are administrative in nature do not 'give rise to absolute immunity from liability in damages under § 1983.'" *Negron–Gaztambide,* 35 F.3d at 28 (quoting *Forrester,* 484 U.S. at 229, 108 S.Ct. at 545); *see also Agromayor,* 738 F.2d at 59–60; *Cutting v. Muzzey,* 724 F.2d 259, 261–62 (1st Cir.1984).

▮ The scope of state legislative immunity from suit under section 1983 is "essentially coterminous" with the absolute immunity accorded members of Congress under the Speech or Debate Clause of the United States Constitution (or "the Clause"). *Harwood,* 69 F.3d at 629 (citing *Supreme Court of Va.,* 446 U.S. at 732–33, 100 S.Ct. at 1974–75). For the Clause to apply, the activity must be " 'an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation, or with respect to other matters which the Constitution places within the jurisdiction of either House.' " *Agromayor,* 738 F.2d at 59 (quoting *Gravel v. United States,* 408 U.S. 606, 625, 92 S.Ct. 2614, 2627, 33 L.Ed.2d 583 (1976)). It does not cover "actions that are only 'casually or incidentally related to legislative affairs,' " *Harwood,* 69 F.3d at 630 (quoting *United States v. Brewster,* 408 U.S. 501, 528, 92 S.Ct. 2531, 2545, 33 L.Ed.2d 507 (1972)), "or which fall outside the 'legitimate legislative sphere.' " *Id.* (quoting *Eastland v. United States Servicemen's Fund,* 421 U.S. 491, 503, 95 S.Ct. 1813, 1821, 44 L.Ed.2d 324 (1975)).

▮ "While the core protection conferred by the Clause concerns speech or debate by a member of Congress on the floor of either the Senate or the House", *id.* (citing *Gravel,* 408 U.S. at 625, 92 S.Ct. at 2627), "the penumbra of the Clause sprawls more broadly." *Id.* For example, the Clause covers voting; *id.* (citing *Kilbourn v. Thompson,* 103 U.S. 168, 204, 26 L.Ed. 377 (1880)); "conduct at legislative hearings," but not "private publication by a Senator on his own behalf of documents submitted at a hearing ..." *Colon Berrios,* 716 F.2d at 90 (citing *Gravel,* 408 U.S. at 624–27, 92 S.Ct. at 2626–27); "members ... and their staffs" for preparation of "an allegedly defamatory report"; *id.*; and members in "voting for its publication," but not "general public dissemination [of the report] by legislative functionaries." *Id.* (citing *Doe,* 412 U.S. at 313–14, 93 S.Ct. at 2025–26). The Clause covers "a committee hearing or report designed to inform the [legislative] membership," but not an individual "Senator's publication of press releases or news letters," *id.* (citing *Hutchinson v. Proxmire,* 443 U.S. 111, 123–33, 99 S.Ct. 2675, 2682–87, 61 L.Ed.2d 411 (1979)), nor individual "political" activities, such as are involved in "legitimate 'errands' performed for constituents, the making of appointments with Government agencies, [and] assistance in securing Government contracts." *Harwood,* 69 F.3d at 631 (alteration in original) (quoting *Brewster,* 408 U.S. at 512, 92 S.Ct. at 2537) (internal quotation marks omitted).

The district court concluded that the Cerro Maravilla hearings "fell well within the legitimate legislative sphere" and "that the defendants are therefore immune from any civil or criminal prosecution based on conduct directly related to the Cerro Maravilla investigations." *Barcelo v. Agosto,* 876 F.Supp. 1332, 1342–43 (D.P.R.1995). The court relied on our earlier analysis of the Hearings:

> The hearings were properly authorized by Puerto Rico Senate Resolution 91 (February 22, 1981), which provides a specific mandate to the Senate Judiciary Committee to inquire into the activities of the police and other agencies of the government leading up to and during the Cerro Maravilla incident as well as the behavior of the executive branch in response to the incident.
>
> Investigations such as this Senate Judiciary Committee investigation constitute

an essential component of the legislative process....

*Id.* (quoting *Colon Berrios,* 716 F.2d at 90).

The district court then held that all of Romero–Barcelo's "claims regarding allegedly unconstitutional procedures employed by the Committee relating to the issuance of subpoenas, the examination of witnesses, and the gathering of evidence, as well as his claims regarding the allegedly unlawful use of public funds to broadcast the hearings and regarding slanderous comments allegedly made by the defendants must be DISMISSED." *Id.* at 1343. The court dismissed the claims against Hernandez–Agosto and Antonio–Rigau, members of the Puerto Rico Legislature, as well as the claim against Perez–Viera, chief counsel and investigator for the Committee. *Id.* at 1343 n. 8 (citing *Eastland v. United States Servicemen's Fund,* 421 U.S. at 507, 95 S.Ct. at 1823 (Speech or Debate Clause immunity for issuance by investigative subcommittee extends to its chief counsel)). The court also rejected Romero–Barcelo's claim "that the defendants abused their positions and, solely [for] political reasons, slanted or manipulated the testimony offered during the hearings to portray the plaintiff in a negative light." *Id.* at 1343 (citing *Tenney,* 341 U.S. at 377, 71 S.Ct. at 788–89 ("The claim of an unworthy purpose does not destroy the privilege.")). The district court ruled, however, that "defendants' alleged dissemination of false, defamatory, and slanderous information about the plaintiff through press releases, interviews, and speeches occurring outside the strict scope of their legislative duties" was not protected by legislative immunity. *Id.* (citing *Hutchinson, Gravel,* and *Doe* ).

### 1. *Allegations of Criminal Misconduct*

▮ Appellant argues that the defendants are liable in damages under section 1983 for their alleged *criminal* conduct—including subornation of perjury, intimidation of witnesses and obstruction of justice during the Hearings—even assuming the Hearings were a proper legislative function. Citing to

*Brewster,* 408 U.S. at 526, 92 S.Ct. at 2544, he relies for further support on the reasoning in *Gravel,* 408 U.S. at 626, 92 S.Ct. at 2627–28; "While the Speech or Debate Clause recognizes speech, voting, and other legislative acts as exempt from liability that might otherwise attach, it does not privilege either Senator or aide to violate an otherwise criminal law in preparing for or implementing legislative acts."

▮ Romero–Barcelo's reliance on *Gravel* and *Brewster* is misplaced, however, as those cases concerned whether a legislative immunity defense based on the Speech or Debate Clause protected Members of Congress from *federal criminal prosecution.* In *Gillock,* the Supreme Court carefully distinguished a State legislator's narrower right to absolute legislative immunity from private civil actions, which does not include immunity from federal criminal prosecution.

> First, *Tenney* was a civil action brought by a private plaintiff to vindicate private rights. Moreover, the cases in this Court which have recognized an immunity from civil suit for state officials have presumed the existence of federal criminal liability as a restraining factor on the conduct of state officials.... Thus, in protecting the independence of state legislators, *Tenney* and subsequent cases on official immunity have drawn the line at civil actions.

445 U.S. at 372–73, 100 S.Ct. at 1193. Absolute immunity from suit for civil damages under section 1983 allegedly based on criminal conduct does not necessarily immunize the legislator or his aide from federal criminal prosecution.[3] But the legislator is immunized from suit for damages under section 1983.

### 2. *Contemporaneous Telecasting of Hearings*

▮ Appellant argues that defendants' decision to use public funds to finance live telecasts of these Hearings was not protected by absolute legislative immunity. The Supreme Court made clear, in *Doe,* 412 U.S. at 313–14, 93 S.Ct. at 2025–26, that the introduction of documents at an open legislative

---

3. As the district court dictum concerning immunity from criminal prosecution "based on conduct directly related to the Cerro Maravilla investigations," *Barcelo,* 876 F.Supp. at 1343, is not necessary to its holding, nor to ours, we do not endorse it.

hearing is protected conduct but a private republication of the documents by a Member of Congress is not. We hold that the legislative decision to sponsor live telecasts of the open Committee hearings authorized a legislative disclosure—rather than a private republication—which clothed defendants with absolute legislative immunity from suit under section 1983.[4] But even assuming the contemporaneous "publication" of the open Hearings went beyond the reasonable requirements of the legislative function, a matter we do not decide, defendants' determination that the Hearings should be televised at public expense constituted legislative conduct absolutely immune from civil suit. *Doe,* 412 U.S. at 315, 93 S.Ct. at 2026 ("Members of Congress are themselves immune for ordering or voting for a publication going beyond the reasonable requirements of the legislative function...."").[5]

### 3. *Immunity of Committee Counsel*

■ Next, appellant argues that the immunity of a legislative aide is less broad than that available to a legislator. Consequently, says appellant, the chief counsel to the Committee, defendant-appellee Perez–Viera, is not immune from suit. Appellant relies on *Dombrowski v. Eastland,* 387 U.S. 82, 85, 87 S.Ct. 1425, 1427–28, 18 L.Ed.2d 577 (1967) (per curiam), wherein the Supreme Court affirmed a grant of summary judgment for the Chairman of a Senate subcommittee but reversed a summary judgment order in favor of subcommittee counsel, explaining that the "doctrine [of legislative] immunity is less ab-

solute, although applicable, when applied to officers or employees of a legislative body, rather than to legislators themselves." Eight years later, the Supreme Court considered whether the absolute immunity of the same Senate Subcommittee Chairman extended to the same subcommittee counsel. *Eastland v. United States Servicemen's Fund,* 421 U.S. at 506–508, 95 S.Ct. at 1823–24. The Court "[drew] no distinction between the Members and the Chief Counsel," *id.* at 507, 95 S.Ct. at 1823, stating that "the day-to-day work of [legislative] aides is so critical to the Members' performance that they must be treated as [the Members'] alter egos...." *Id.* (alteration in original) (quoting *Gravel,* 408 U.S. at 616–17, 92 S.Ct. at 2622–23) (internal quotation marks omitted). It noted, however, that "[t]he complaint ... does not distinguish between the activities of the Members and those of the Chief Counsel," thereby distinguishing *Dombrowski v. Eastland. Id.*

Appellant argues that his complaint does distinguish between the activities of Hernandez–Agosto and Antonio–Rigau, on the one hand, and Perez–Viera on the other. Nevertheless, the relevant allegation in the complaint—that chief counsel Perez–Viera presented information at the Committee hearings, knowing it to be false and misleading—is part and parcel of the parallel allegation that all legislator-defendants used the Hearings to disseminate information about Romero–Barcelo, knowing it to be false or misleading. Thus, in applying the

---

4. In *Hutchinson,* 443 U.S. at 116 n. 3, 99 S.Ct. at 2678 n. 3, the Supreme Court said: "we assume, without deciding, that a speech printed in the Congressional Record carries immunity under the Speech or Debate Clause as though delivered on the floor." Accordingly, the Court did not take issue with a district court suggestion that "a television or radio broadcast of [a Senator's] speech from the Senate floor" would receive the protection of the Speech or Debate Clause. *Id.* at 119, 99 S.Ct. at 2680. But the Court did not agree with the suggestion that such a broadcast is analogous to a Senator issuing a press release relating to a floor speech. *Id. See also Cable News Network v. Anderson,* 723 F.Supp. 835 (D.D.C.1989) (Speech or Debate Clause bars judicial review of House rule regulating television coverage of hearings).

5. Appellant argues that it was improper to grant judgment for defendants under Rule 12(b)(6), because further factfinding was required to determine whether their decision to use public funds to finance live telecasts is protected by absolute legislative immunity. Appellant relies on dicta in *Colon Berrios,* declining to reach "the issue of whether the Senate's expenditure of funds for live television broadcast of the hearings falls within the legitimate legislative sphere" because, *inter alia,* it "would involve extensive factfinding" relating to First Amendment issues regarding prior restraint. 716 F.2d at 90 n. 3. In this case, however, there is no need to reach the First Amendment matters which loomed in *Colon Berrios,* since we are not reviewing a Rule 12(b)(6) denial of injunctive relief, but a dismissal of a civil rights action for damages based in part on a broadcast which has already occurred.

doctrine of absolute legislative immunity to these facts, we draw no distinction between the legislator-defendants and Committee counsel.

### B. *Civil Rights Claims*

We next consider the claims not barred by absolute legislative immunity.

#### 1. *Section 1983*

■ "An actionable section 1983 claim must allege facts sufficient to support a determination '(i) that the conduct complained of has been committed under color of state law, and (ii) that [the alleged] conduct worked a denial of rights secured by the Constitution or laws of the United States.' " *Rumford Pharmacy, Inc. v. City of East Providence,* 970 F.2d 996, 998 (1st Cir.1992) (quoting *Chongris v. Board of Appeals,* 811 F.2d 36, 40 (1st Cir.), *cert. denied,* 483 U.S. 1021, 107 S.Ct. 3266, 97 L.Ed.2d 765 (1987)).

#### a. *Procedural Due Process*

■ A viable procedural due process claim must demonstrate a "deprivation by state action of a constitutionally protected interest in 'life, liberty, or property' ... *without due process of law.*" *Lowe v. Scott,* 959 F.2d 323, 340 (1st Cir.1992) (quoting *Zinermon v. Burch,* 494 U.S. 113, 125, 110 S.Ct. 975, 983, 108 L.Ed.2d 100 (1990)) (internal quotation marks omitted).[6]

#### i. *Deprivation of Liberty Interest*

■ Romero–Barcelo alleges that the defamatory statements by defendants deprived him of a "liberty" interest in his good name and reputation. *Barcelo,* 876 F.Supp. at 1344. The Supreme Court has made it clear that an actionable deprivation of a liberty interest in one's reputation "must be accompanied by a change in the [victim's] status or rights (under substantive state or federal

law), perhaps as a touchstone (or concrete evidence) of the fact that the injury to reputation was inflicted as part of a conscious government policy and is serious enough to interfere with other liberties of the sort suggested in *Meyer* [*v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923) ]," *Beitzell v. Jeffrey,* 643 F.2d 870, 878 (1st Cir.1981) (citing *Paul v. Davis,* 424 U.S. 693, 706, 708, 710, 96 S.Ct. 1155, 1163, 1164, 1165, 47 L.Ed.2d 405 (1976) (in the absence of more tangible interests such as employment, reputation alone is neither a "property" interest nor a "liberty" interest sufficient to require procedural due process)), such "as the right 'to engage in any of the common occupations of life,' or 'to marry, to establish a home and bring up children.' " *Id.* at 877 (citing *Meyer,* 262 U.S. at 399, 43 S.Ct. at 626–27). As this court indicated in *Beitzell,* no constitutionally protected "liberty" interest in reputation is infringed unless the reputational harm is "unusually serious ... as evidenced by the fact that employment (or some other right or status) is affected." *Id.* at 878.

■ The district court concluded that no serious harm had befallen Romero–Barcelo. *Barcelo,* 876 F.Supp. at 1345. It observed that he had been elected Resident Commissioner in 1992, "immediately after the last barrage of allegedly libelous statements." *Id.* The district court noted as well that Romero–Barcelo had lost the gubernatorial election in 1984, but it ruled that any claim based on that "serious harm," some eight years earlier, was .time-barred. *Id.* at 1346 (citing *Wilson v. Garcia,* 471 U.S. 261, 276, 105 S.Ct. 1938, 1947, 85 L.Ed.2d 254 (1985) (in section 1983 action, court borrows local limitation period applicable to personal injury actions)); *Calero–Colon v. Betancourt–Lebron,* 68 F.3d 1, 2–3 (1st Cir.1995) (citing to P.R.Laws Ann. tit. 31, § 5298(2) (1991)) (one-year limitation on personal injury actions).[7]

---

6. Of course, if the challenged conduct constitutes "state action," the "color of state law" requirement is met as well. *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 935, 102 S.Ct. 2744, 2752, 73 L.Ed.2d 482 (1982).

7. Appellant misplaces reliance on *Limerick v. Greenwald,* 666 F.2d 733 (1st Cir.1981), wherein a timely complaint alleged that defendants' ac-

tions threatened "unusually serious harm" to plaintiffs' reputations, "stripping them of their responsibilities as bank managers and threatening their future employability." *Id.* at 735. On appeal, Romero–Barcelo claims, for the first time, that his law practice suffered. He urges us to assume as much based on defendants' efforts to brand him as a "murderer" and "assassin." We decline his invitation to bypass trial court

### ii. *The Process Due*

■ Romero–Barcelo. claims a deprivation of his right to be free from " 'abusive attacks on his honor, reputation and private or family life' as established by Article II, Section 8, of the Puerto Rico Constitution." *Barcelo,* 876 F.Supp. at 1346.[8] Although the Section 8 claim is based in commonwealth law, hence not directly actionable under section 1983, *Quintero de Quintero v. Aponte–Roque,* 974 F.2d 226, 230 (1st Cir.1992), Section 8 may give rise to a constitutionally protected "liberty interest." Assuming *arguendo,* as did the district court, that Section 8 creates a constitutionally protected "liberty" interest, we consider whether Romero–Barcelo received the process due.

■ The process due depends in large part on the circumstances. *Watson v. Caton,* 984 F.2d 537, 540–41 (1st Cir.1993) (per curiam) (citing *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976)). As noted in *Watson,* the "cases distinguish sharply between deprivations caused by 'random, unauthorized' conduct of state officials, and deprivations caused by conduct 'pursuant to established state procedure.'" *Id.* at 541 (quoting *Hudson v. Palmer,* 468 U.S. 517, 532, 104 S.Ct. 3194, 3203, 82 L.Ed.2d 393 (1984)). "For the former, the state is not automatically liable; in the latter case there may be liability where the state policy approves or directs the conduct but falls below constitutional standards." *Id.* (footnote omitted). Romero–Barcelo does not *claim,* however, that defendants' unimmunized actions were taken pursuant to either the Commonwealth's direction or its established policy. Rather, he alleges that defendants made numerous libelous statements "in television studios, in political speeches made throughout the island, and in political press releases." *Barcelo,* 876 F.Supp. at 1345. Nor has he alleged that the actions complained of were other than "random, unauthorized conduct" on the part of the individual defendants.

It is rudimentary that a deprivation of procedural due process caused by "random, unauthorized conduct" of a State official is not actionable under section 1983 unless, amongst other things, "no adequate 'post-deprivation remedy' is available under state law." *Perez–Ruiz v. Crespo–Guillen,* 25 F.3d 40, 42 (1st Cir.1994). Romero–Barcelo neither alleged nor established that Puerto Rico law affords no adequate remedy for whatever liberty interest deprivation may have been sustained under Section 8 of the Puerto Rico Constitution. Absent either an allegation regarding the inadequacy of commonwealth tort remedies for slander and libel, or even argumentation on the point, we decline to address the question. *See Rumford Pharmacy Inc.,* 970 F.2d at 999; *Monahan v. Dorchester Counseling Ctr., Inc.,* 961 F.2d 987, 994 n. 7 (1st Cir.1992). We note further that the district court's conclusion that Section 8 "is the main source of protection against libel and slander under Puerto Rico law," *Barcelo,* 876 F.Supp. at 1346 n. 11 (citing *Cortes Portalatin v. Hau Colon,* 3 T.P.R. 1019 (1975)), is not challenged on appeal. *See also Willhauck v. Halpin,* 953 F.2d 689, 704 (1st Cir.1991) (court of appeals may "affirm on any independently sufficient ground").

### b. *The First Amendment Claim*

■ Appellant claims violations of his First Amendment rights to freedom of speech and association. Before the district court he claimed "that his right to free speech was chilled and his right to associate with the NPP was adversely affected by the [allegedly] defamatory statements made by the defendants." *Barcelo,* 876 F.Supp. at 1348. The district court found, however, "that given the fact that he was elected Resident Commissioner on the NPP ticket, [Romero–Barcelo's] claims regarding injury to his right to associate with the NPP ring hollow." *Id.* Further, the court concluded that "there [was] no indication that the defendants compelled the plaintiff to advocate either an unpopular or any other type of

8. Article II, § 8, provides: "Every person has the right to the protection of law against abusive attacks on his honor, reputation and private or family life." P.R. Const., art. II, § 8.

consideration of this factual question in the first instance. *See Havinga v. Crowley Towing and Transp. Co.,* 24 F.3d 1480, 1483 n. 5 (1st Cir. 1994).

view." *Id.* at 1348 n. 15 (contrasting *Wooley v. Maynard,* 430 U.S. 705, 714–15, 97 S.Ct. 1428, 1435, 51 L.Ed.2d 752 (1977) (requiring display of "Live Free or Die" motto on vehicle license plate violates First Amendment right "to refrain from speaking.")). We agree.

On appeal, however, Romero–Barcelo contends that he "alleged that he was singled out for ... harassment and deprivation of rights because of his beliefs and political association." The crux of this argument is that defendants' alleged conduct, both within the Hearings and without, was undertaken because of Romero–Barcelo's association with the NPP. The Supreme Court has held that the First Amendment "protects nonpolicymakers from being drummed out of public service on the basis of their political affiliation or advocacy of ideas." *Correa–Martinez v. Arrillaga–Belendez,* 903 F.2d 49, 56–57 (1st Cir.1990) (citing *Branti v. Finkel,* 445 U.S. 507, 517, 100 S.Ct. 1287, 1294, 63 L.Ed.2d 574 (1980); *Elrod v. Burns,* 427 U.S. 347, 357, 96 S.Ct. 2673, 2681–82, 49 L.Ed.2d 547 (1976) (plurality opinion)). But Romero–Barcelo most assuredly qualified as an NPP policymaker. *See id.* at 57 n. 6. Thus, the district court correctly found no First Amendment protection for "a politician whose rights to freedom of speech, freedom of association, and freedom 'to disassociate [oneself] from unpopular views' have been injured by other politicians seeking to undermine his credibility within his own party and with the electorate." *Barcelo,* 876 F.Supp. at 1348 (alteration in original) (footnote omitted).

### 2. *Section 1985(3)*

 An actionable section 1985(3) claim must allege that (i) the alleged conspirators possessed "some racial, or perhaps otherwise class-based, invidiously discriminatory animus," *Griffin v. Breckenridge,* 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971), and (ii) their alleged conspiracy was "aimed at interfering with rights ... protected against private, as well as official, encroachment." *United Bhd. of Carpenters & Joiners of America v. Scott,* 463 U.S. 825, 833, 103 S.Ct. 3352, 3358–59, 77 L.Ed.2d 1049

(1983). *See also Libertad v. Welch,* 53 F.3d 428, 446 (1st Cir.1995) (citing *Bray v. Alexandria Women's Health Clinic,* 506 U.S. 263, 267–68, 113 S.Ct. 753, 758, 122 L.Ed.2d 34 (1993)). The conspiracy allegation must identify an overt act. *See Griffin,* 403 U.S. at 93, 91 S.Ct. at 1793–94; *Libertad,* 53 F.3d at 450 n. 18. If no racial animus is charged, a discriminatory class-based animus must be alleged. *See Harrison v. Brooks,* 519 F.2d 1358, 1359 (1st Cir.1975) (citing *Griffin,* 403 U.S. at 102, 91 S.Ct. at 1798). "The requirement that the discrimination be 'class-based' is not satisfied by an allegation that there was a conspiracy which affected the interests of a class of persons similarly situated with the plaintiffs. Rather, the complaint must allege facts showing that the defendants conspired against the plaintiffs because of their membership in a class and that the criteria defining the class were invidious." *Id.* at 1359–60.

 The complaint alleged that the three defendants "conspired ... to launch a negative publicity campaign funded with public funds and to label [him] as an assassin and murderer in order to end his political career and enhance their own. [The] defendants allegedly used their elected political positions to keep the Committee investigations alive, and to reactivate those committee hearings at politically advantageous opportunities." *Barcelo,* 876 F.Supp. at 1349. The district court held these allegations insufficient to support a conspiracy claim under section 1985(3), rejecting the implicit *assumption* that "since the defendants are members of the opposing political party and had substantial control over the Committee hearings, they must have had a conspiracy." *Id.* at 1350. The court further found no allegation of an overt act, and no articulation of a "clear class-based invidious discriminatory animus behind the alleged actions of the alleged conspirators." *Id.* We agree that Romero–Barcelo's allegations were insufficient to support a section 1985(3) claim.

On appeal, Romero–Barcelo does not address these specific shortcomings in the complaint, choosing instead to rest upon a conclusory statement that the allegations are

sufficient for a section 1985(3) claim,[9] and the argument that the heightened pleading requirement for section 1985(3) conspiracy claims under *Slotnick v. Staviskey*, 560 F.2d 31, 33 (1st Cir.1977), *cert. denied*, 434 U.S. 1077, 98 S.Ct. 1268, 55 L.Ed.2d 783 (1978) ("[C]omplaints cannot survive a motion to dismiss if they contain conclusory allegations of conspiracy but do not support their claims with references to material facts."), is no longer good law, citing to *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993). *Leatherman* rejected a "heightened pleading standard" in civil rights actions claiming municipal liability under section 1983. *Id.* at 164–65, 113 S.Ct. at 1161. Even assuming *Leatherman* applies to the present claim, a matter we need not address, we do not view the failure to allege essential elements of a section 1985(3) claim as any mere failure to comply with a "heightened pleading requirement." *See Griffin*, 403 U.S. at 102–103, 91 S.Ct. at 1798–99.

### III

### *CONCLUSION*

For their alleged conduct within the legislative forum, we conclude that defendants were protected by absolute legislative immunity. For their conduct outside the legislative forum, the allegations were insufficient to state actionable claims under sections 1983 and 1985(3). Appellant Romero–Barcelo has no actionable procedural due process claim under section 1983, either because he had no constitutionally protected "liberty" interest, or because Puerto Rico law afforded whatever post-deprivation process may have been due. Nor did appellant have an actionable First Amendment claim, since there is no constitutional ban against the alleged conduct. Finally, appellant failed to plead all essential elements of an actionable conspiracy claim under section 1985(3).

9. Although appellant argues that he should have been given an opportunity to amend the complaint, our review of the record on appeal dis-

closes no indication that he made such a request below.

*The district court judgment is affirmed. Costs to appellees.*